SARAH H. SNOW *vs.* THE MERCHANTS NATIONAL BANK OF
NEW BEDFORD.

Bristol.    October 28, 1940. — June 24, 1941.

Present: FIELD, C.J., DONAHUE, DOLAN, COX, & RONAN, JJ.

*Bank and Banking. Fiduciary. Agency,* Scope of authority. *Deceit.
Contract,* Performance and breach. *Evidence,* Opinion: expert; Cumu-
lative. *Practice, Civil,* Exceptions: whether error harmful. *Error,*
Whether harmful. *Witness,* Expert.

Although, on uncontradicted findings by an auditor, a finding was war-
ranted that a bank officer acted within his ostensible authority for
it in his dealings respecting investments with one of the bank's cus-
tomers, an elderly widow uninformed in financial matters, a further
finding would not have been warranted that the bank through the
officer was guilty of any deceit or bad faith toward the customer or
breach of any contract to give her sound, unbiased advice.

Uncontradicted findings by an auditor would not have warranted a find-
ing that a bank, in buying and selling securities for an elderly widow,
uninformed as to financial matters, through an investment depart-
ment which it maintained under an arrangement with an investment
concern, was acting, or could reasonably have been thought by the
customer to have been acting, in a fiduciary capacity toward her.

No prejudicial error appeared in the exclusion of certain evidence after
it had been admitted *de bene,* where it appeared that it was merely
cumulative on an issue in effect treated by this court as having been
proved by the excepting party.

No error appeared in the exclusion of opinion testimony on the ground
that the witness was not qualified.

CONTRACT OR TORT, with a declaration as amended in
three counts.   Writ in the Superior Court dated November
1, 1933.

The case was tried before *Dillon,* J., who ordered a verdict
for the defendant and reported the case.

*J. C. Jones, Jr.,* for the plaintiff.

*J. C. Reilly,* (*J. D. Kenney* with him,) for the defendant.

DOLAN, J.   This is an action of tort or contract which
arises out of various transactions between the plaintiff and
the defendant as a result of which the plaintiff claims to
have been damaged.   The declaration is in three counts.

The first count is in contract and alleges in substance that the defendant, standing in a fiduciary relationship to the plaintiff, undertook to give her sound and unbiased advice with reference to securities and investments, that for its own secret profit it established a bond department "so called," and wholly unmindful of the existing fiduciary relationship, and its contractual obligations, entered into contracts or arrangements with a brokerage firm (Harris, Forbes & Company, Incorporated) through which it secretly profited in connection with the purchase and sale of securities by the plaintiff made upon unsound and biased advice of the defendant, to her loss. The second count is in tort and contains allegations which are substantially the same as those in the first count. The third count alleges deceit in that the defendant made fraudulent representations which the plaintiff relied upon to her own detriment and the defendant's gain. The defendant's answer is a general denial. The case was referred to an auditor who found for the defendant. Thereafter the case was tried to a jury on the auditor's report and other evidence introduced by the plaintiff. The defendant offered no evidence either before the auditor or at the trial before the jury, and during the course of the trial before the jury the plaintiff excepted to the exclusion of certain evidence. At the close of the plaintiff's case the defendant rested and moved that a verdict be directed for it. The motion was allowed, and the case now comes before us on the report of the judge.

The evidence in its aspect most favorable to the plaintiff would warrant the jury in finding the following facts: The plaintiff is a widow seventy-seven years of age. She had no "school education" after she was "sixteen" and married when she was "twenty-one." She became a widow in 1905. By inheritance she was possessed of various stocks and bonds. From 1881 up to 1932 she had banking connections only with the defendant. She was not well informed in the matter of investments. She did know that bonds were better than stocks "because if a firm went out of business the money for the bonds was paid before the money for the stocks." She cut coupons on bonds when

due. She did not know what an "overdraft at a bank is." From 1927 to 1932 she had no particular knowledge of the securities involved. She had some knowledge of "one or two of the . . . old things . . . [she] inherited." She did not know how to find the price at which bonds or stocks were selling. She had visited certain stock exchanges.

One Leland became president of the defendant bank a few years before 1927. Prior to that time the plaintiff consulted with one Mosher, who was then president of the bank, about buying and selling securities. It was her custom to take all papers sent to her about the purchase of stock to Mosher. "She took his advice" which was freely given and just as freely accepted and acted upon. Mosher introduced the plaintiff to Leland when he became president of the bank and said, in effect, that Leland, as representative of the bank, would take care of her. Leland asked her to come to him if she needed his or the bank's assistance. Thereafter, and until some time in April, 1932, the plaintiff consulted Leland with regard to her financial affairs and transactions and relied upon his advice relative to the purchase and sale of securities. She always consulted him at the bank. He never visited her home. There was no evidence that any of the directors of the bank knew, either before or after April 4, 1927, that the plaintiff was receiving advice from Leland and was relying on him for advice in relation to buying and selling securities, though they knew that prior to 1927 the bank's customers habitually sought advice of its officers as to investments. On April 4, following a vote of March 22, 1927, the directors of the bank established a "bond department" in accordance with a plan submitted to them by Leland. This action was recommended by Leland to save the time of bank officers, much of which had been consumed formerly by persons seeking advice with regard to investments. The directors knew that the function of the new department was to deal with investments for the bank's depositors.

The bond department, also known as the "investment department," was organized under the terms of an agreement with the brokerage house of Harris, Forbes & Com-

pany, Incorporated, by which the department was to be in charge of an agent of the latter. The defendant agreed to provide space in the bank and also clerks and stenographic help when needed. On sales made to the bank's customers the Harris Forbes company was to pay commissions to the bank. From April, 1927, through April, 1932, the bank received $23,850.29 in these commissions, which included $1,353.40 on sales made to the plaintiff. There was no discussion between her and Leland with reference to the payment of commissions by the Harris Forbes company to the bank. It was also agreed that, if the Harris Forbes company business increased in New Bedford through the bank's customers, "the bank would receive participation in selling group issues put out by Harris Forbes." It did receive such "participations, and this compensation was over and above the ordinary commission allowed the ordinary stock broker." Bonds purchased by the bank under the selling group arrangement were in some instances bought for its own account, and in others were disposed of by the bond department. "In some instances some of the bonds purchased under these selling group arrangements were disposed of by sale by the bank" to the plaintiff. There is no evidence that the price paid by her for these bonds exceeded the market price at the date of purchase by her. Some of the directors knew that the bank was receiving commissions on sales to the bank's customers from Harris, Forbes & Company, Incorporated. Earnings of the bond department were entered in the bank's general ledger. Monthly statements from the Harris Forbes company to the bank showed in detail the commission it paid the bank when the plaintiff was "buyer or seller." On April 12, 1927, the bank had given the plaintiff a receipt for her securities which read, "to be held at present and probably sold a little later by Mr. Leland." The receipt was signed "The Merchants National Bank of New Bedford, by L. A. Potter."

It was the practice of the bank, prior to 1927, to charge a commission for purchases of securities made for its customers, but up to that time none of the statements received by the plaintiff indicated that the defendant was charging

her commissions on purchases made for her. After the establishment of the bond department and the plaintiff had made purchases of securities, the sales to her would sometimes be confirmed by letter to her from Harris, Forbes & Company, Incorporated, reciting that, in accordance with advice from the bond department of the bank, it (the Harris Forbes company) had sold to her the securities in question, that in regular course it would send her a statement of the transaction and would ship the securities to her in care of the bank. These notices concluded thus: "Thanking you very much for this business, we are Very truly yours, Harris, Forbes & Co., Inc." Other letters of similar import were sent her by the Harris Forbes company.

"During the years 1925–1926 . . . [the plaintiff's] purchases totaled $55,896.18." On April 11, 1927, her bank balance was $109.20. During the period 1927–1932 the plaintiff engaged in three hundred six transactions with the bond department upon the advice of Leland, except that in at least two instances he arranged to purchase securities for the plaintiff before consulting her. She acquiesced in these purchases, however, before they were actually made. In one instance, on his advice, she sold one of her favorite investments "when loath to do so." On one occasion Leland told her that he sometimes talked with the Harris Forbes company representative after banking hours and "got his advice." In many instances securities purchased by the plaintiff were paid for through debit slips put through the bank's draft department and sent to her with her "monthly cancelled checks." The debit slips read, in part, "as per bill of Harris Forbes & Co." Checks for her security purchases were often "made out" by Leland and on other occasions by "somebody" in the bank. The inference is that they were signed by the plaintiff. On or about April 29, 1932, she closed out her checking account in the bank and withdrew her securities from her vault.

The auditor found that there was no evidence that Leland or anyone connected with the bank knew or ought to have known that, in buying or selling the securities that the plaintiff bought and sold during the period in question, it

was probable she would suffer loss thereby; that neither Leland nor any other person for whose conduct the bank is responsible intended to defraud or cheat her; that neither Leland nor anybody connected with the bank made any false representations to her regarding the securities that she bought and sold.  He also found that there was no evidence to show that, if the plaintiff suffered any damage, it resulted from any act of the defendant, its servants or agents rather than from the depression or any other cause, and that Leland and the directors of the bank believed that the commission and compensation the bank was receiving from Harris, Forbes & Company, Incorporated, were matters that they were under no duty to disclose to the plaintiff and "people like her."  Since there is nothing within the auditor's report or outside it that would warrant findings contrary to those just set forth, they must stand.  *Cook* v. *Farm Service Stores, Inc.* 301 Mass. 564.  It follows that there was no error on the part of the judge in directing a verdict for the defendant in so far as the third count was concerned, since it is based on allegations of fraud and deceit.

The parties have argued at some length the question whether the evidence would warrant a finding that Leland was authorized to advise the plaintiff with reference to the purchase and sale of securities and to arrange therefor.  We are of opinion that, on all the evidence and in the light of the facts which we have already said the jury could warrantably find, they could also properly find that Leland had at least ostensible or apparent authority to enter into the transactions in question in behalf of the bank as part of its business and for profit, and that the plaintiff relied upon the manifestation of authority.  See *Nowell* v. *Equitable Trust Co.* 249 Mass. 585, 594; *England Brothers, Inc.* v. *Miller,* 274 Mass. 239, 242; *Lonergan* v. *Highland Trust Co.* 287 Mass. 550, 556; *Federal National Bank of Boston* v. *O'Connell,* 305 Mass. 559, 566–567; *Schleifer* v. *Worcester North Savings Institution,* 306 Mass. 226, 228–229.  Am. Law Inst. Restatement: Agency, § 27.  See also *Welch* v. *Corey,* 201 Mass. 165.  There is nothing, however, in the

evidence to warrant a finding that in the exercise by Leland
of this apparent authority he had acted other than in good
faith and properly in his dealings with the plaintiff, or to
warrant a finding of any breach of contract on the part of
the defendant.

The question remains whether in the transactions in-
volved a fiduciary relationship existed between the parties.
The auditor found that "so far as it was a question of fact,
. . . there was no fiduciary relationship between the plain-
tiff and the defendant."

In *Hawkes* v. *Lackey*, 207 Mass. 424, 432, the court said:
"Wherever two persons stand in such a relation that, while
it continues, confidence is necessarily reposed by one,
and the influence which naturally grows out of that confi-
dence is possessed by the other, and this confidence is
abused, or the influence is exerted to obtain an advantage
at the expense of the confiding party, the person so avail-
ing himself of his position will not be permitted to retain
the advantage, although the transaction could not have
been impeached if no such confidential relationship had ex-
isted." In *Comstock* v. *Livingston*, 210 Mass. 581, at page
584, the court said: "Mere respect for the judgment of
another or trust in his character is not enough to constitute
such a relation. There must be such circumstances as in-
dicate a just foundation for a belief that in giving advice
. . . one is acting not in his own behalf, but in the inter-
ests of the other party. If the relation is a business one,
the existence of mutual respect and confidence does not
make it fiduciary." In the present case we are of opinion
that the evidence would require a finding that the relations
between the parties were of a business character. In deal-
ing with the plaintiff, Leland was engaged in the business
of the bank in buying and selling securities for its customers,
in the pursuit of which it had established its bond, some-
times called investment, department. Its bond depart-
ment occupied space in the banking quarters. It derived
a profit from the conduct of this department. We think
that the evidence would not warrant the jury in finding
that in all the circumstances the plaintiff could reasonably

be of the opinion that the service rendered her was to be performed by the defendant through Leland acting in a fiduciary rather than a business relation. In fact the evidence would require a finding that she knew that commissions were being charged her by Harris, Forbes & Company, Incorporated, in connection with purchases and sales made by Leland through that concern for her. That the bank in turn received from Harris, Forbes & Company, Incorporated, the usual commission that the company would receive in the respective transactions did no damage to the plaintiff, and we are of opinion that, in all the circumstances, it could not be found properly that in these business transactions between the parties the failure of Leland to disclose to her that the bank was receiving commissions on them or making a profit thereon was a breach of any duty owed to her, or that the plaintiff had a right, in all the circumstances, to believe that the bank, in its conduct of buying and selling securities for her in over three hundred transactions, involving purchases totaling almost $500,000 and sales totaling over $330,000, was acting in a fiduciary capacity.

At the trial before the jury certain testimony offered by the plaintiff had been admitted by the judge *de bene*. This testimony was to the effect that before Leland became president she consulted Mosher about buying and selling of stocks. Thereafter she always went to Leland. She had these "inheritances." She "didn't do any business with them . . . the stocks and bonds . . . [she] didn't pretend to manipulate them at all." When "things came up to be changed, or stock added, or to be sold, when any business matter came up relative to what . . . [she] owned . . . [she] went right to Mr. Leland." Sometimes she would receive a message from him to go to the bank and see him and she would do so. She did not know from whom she was buying the stocks and bonds "but through the bank, that is all I can say." When she went to Leland's office he would say, "'Now, Mrs. Snow, I have sent for you to come in. I want to ask you, I want to tell you what I am going to do. I'm going to sell this, or sell that and then I think

I shall buy so and so.' 'Well,' I said, 'Very well, if that is the right thing to do, Mr. Leland. I have to depend entirely on your judgment, because I know nothing about these things. I wasn't brought up to take care of money and I don't know anything about it, and therefore, since Mr. Mosher died, and my mother died and my husband died, I have come to you for advice, and must depend upon you. I must depend upon somebody and so I depend upon you.'" While we are of opinion that this evidence could be admitted properly as bearing upon the ostensible or apparent or implied authority of Leland to act for the bank, it is plain from what we have already said, in holding that the jury would be warranted in finding that Leland did have at least apparent authority, that the excluded evidence was but cumulative and that its exclusion was not prejudicial error.

The only other exception of the plaintiff is to the exclusion of the testimony of an expert offered by the plaintiff to prove the type and character of the securities that she had purchased on the advice of Leland. This evidence was excluded by the judge on the ground that the witness was not qualified to testify as an expert on any issue in the case. We cannot say that there was error in refusing to admit this testimony. Except in rare instances where, as matter of law, the exclusion of the proffered evidence would be unwarranted, the preliminary question of the qualification of a witness called as an expert must rest with the trial judge. *Biancucci* v. *Nigro,* 247 Mass. 40, 44. *Langis* v. *Danforth,* 308 Mass. 508, 510, 511, and cases cited.

Judgment is to be entered for the defendant on the directed verdict.

*So ordered.*