LEW ORTH & another *vs.* PARAMOUNT PICTURES, INC., & others.

Suffolk. November 3, 1941. — May 28, 1942.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & RONAN, JJ.

*Unfair Competition. Equity Pleading and Practice,* Appeal, Report.

Appeals from interlocutory decrees confirming a master's report and denying a motion for final decree were not before this court upon a report under G. L. (Ter. Ed.) c. 214, § 30, of the question whether on the master's report the plaintiff had established the defendant's liability.

Upon confirmation of a report of a master, to whom a suit in equity had been referred "to find the facts upon the question of liability of the defendants," and denial of the defendants' motion for a final decree dismissing the bill, the judge with the consent of the parties could treat such motion as raising the question, whether on the report the plaintiff had established the defendants' liability, and could report that question to this court under G. L. (Ter. Ed.) c. 214, § 30.

An author of a short skit, which formed one of the numbers of several revues and was exhibited in theatres in various localities for about a year under a title not referred to in his advertising and brought to the attention of the public only through programs or announcements in theatres, was not subjected to unfair competition by the production and exhibition, seven years and fourteen years respectively after the exhibition of the skit had ceased, of motion pictures having the same title as that of the skit but otherwise bearing no resemblance to it and not employing the idea thereof.

BILL IN EQUITY, filed in the Superior Court on August 8, 1939.

The suit was reported by *Sheehan, J.*

*A. E. Whittemore,* (*E. C. Mower* with him,) for the defendants.

*F. I. Rose,* (*M. J. Zieman* & *H. W. Finbury* with him,) for the plaintiffs.

QUA, J.  The plaintiffs seek to restrain the defendants from using the name "Million Dollar Legs" in connection with any motion picture or play and for an accounting of profits and damages, on the ground that the plaintiffs had first written and produced a "short play" bearing that title, and that the defendants are competing unfairly with the plaintiffs.  The bill is not based upon infringement of copyright.

The cause was referred to a master to "find the facts upon the question of liability of the defendants or either of them" and "upon such determination" to file his report and to await the further order of the court.  The defendants appealed from an interlocutory decree confirming the master's report and thereafter moved for a final decree dismissing the bill and appealed from an interlocutory decree denying the motion.  Thereupon the judge signed a report to this court reciting that the master had heard the case on the question of liability only; that at the hearing before the judge of the defendants' motion for a final decree dismissing the bill all parties agreed that "the question of liability should be finally determined at this stage of the proceedings"; that he had denied the motion; and that, being of opinion that his ruling so affected the merits of the controversy that the accuracy thereof should be determined before further proceedings were had, at the request of the defendants he stayed all further proceedings except such as might be necessary to preserve the rights of the parties and reported "the question of law presented by . . . [his] said ruling."

On this record neither appeal is properly before us.  Under the present practice appeals from interlocutory decrees cannot be entered here until after final decree in the Superior Court.  *Barnes* v. *Barnes*, 291 Mass. 383, 387.  *Leffler* v. *Todd*, 308 Mass. 243, 245.  See *McCracken's Case*, 251 Mass. 347, 350.  This seems an almost necessary consequence of statutory provisions now embodied in G. L. (Ter. Ed.) c. 231, § 135, introducing rigid requirements as to the time of each step in perfecting an appeal.  See St. 1929, c. 265, § 1, and its amendment by St. 1931, c. 219; *Niosi* v.

*Leveroni,* 274 Mass. 115. If this were not so, as the statute now reads every interlocutory appeal would have to be fully completed and the papers printed and entered in this court, unless "for cause shown after hearing" the trial court should extend the time, no matter how inconsequential the subject of the appeal might become in the subsequent course of the litigation. A construction of the statute that would produce such a result would be hard to reconcile with the wording of the present c. 231, § 135, would cause unnecessary expense to litigants, and is not to be adopted. The rule of practice existing before the statute of 1931 seems to have differed somewhat from the present rule as here stated, and statements appropriate to the former rule have been repeated in some of the cases since the passage of that statute. *Fuller* v. *Chapin,* 165 Mass. 1. *Hutchins* v. *Nickerson,* 212 Mass. 118, 120. *Romanausky* v. *Skutulas,* 258 Mass. 190, 192. *Siciliano* v. *Barbuto,* 265 Mass. 390, 393, 394. *Knox* v. *Springfield,* 273 Mass. 109, 110. *Rowe* v. *Bragg,* 300 Mass. 298, 299.

When this record was entered here the case was not ripe for final decree in the Superior Court because the judge's denial of the defendants' motion that a decree be entered dismissing the bill, as long as it stood unchanged, left the case open for further proceedings in that court. But the recitals in the report show that with the consent of all parties the judge treated the defendants' motion as raising the question whether on the master's report as it stood the plaintiffs had made out a case entitling them to an accounting for profits or an assessment of damages. The reference to the master had been limited with a view to raising this question before entering upon a possibly lengthy hearing as to profits or damages or both. We think that the judge could report this question under G. L. (Ter. Ed.) c. 214, § 30, as a question arising upon the making of an interlocutory decree, and that the case is properly here on the report.

The plaintiffs had formerly been associated together in writing and producing musical comedy revues. In March, 1924, they copyrighted a short skit under the title "Million

Dollar Legs." The full text of this skit fills only about four pages of the printed record. It took about fifteen minutes to play. The central idea or "punch" consists in the partial disclosure on the stage of a pair of shapely legs which are supposed to be those of a female artist's model but which at the end of the skit are suddenly revealed to be the legs of a man. The words "million dollar legs" occur three times in the dialogue. People who saw the skit would associate those words with it. The idea was novel and was well received by the public. The skit was used from March, 1924, until April, 1925, as one of the numbers of a revue produced by the plaintiffs. The plaintiffs had approximately twenty-one different revues, each with a different title. Each revue contained from five to seven scenes and lasted about an hour. During most of the period from March, 1924, until April, 1925, the skit was played as one of the numbers of the revue entitled "Step Lively." In the latter part of the period it was played as one of the numbers of the revue "Keep Moving." "In the nineteen twenties it was usual to have a show consist of variety act, news reel and one big picture." The plaintiffs' advertising matter emphasized their own names, describing them as "Tip Top Merrymakers," and often included the names of the revues to be played, but in their advertising no reference was made to the skit "Million Dollar Legs." So far as appears the title of the skit was brought to the attention of the public only "by programs or by announcement through a master of ceremonies." Programs were used "in many of the theatres" — how many does not appear. Where the show was "sold outright" no programs were used. In some of the theatres where no programs were used — how many does not appear — an announcer "informed the audience about the various acts." In this way between March, 1924, and April, 1925, the skit was exhibited as one number in a revue three times a day on one hundred twenty-nine days to a total of approximately three hundred twenty-two thousand five hundred people in about forty cities and towns in Indiana, Pennsylvania, New York, Connecticut,

Rhode Island, Massachusetts, and Maine, and in Halifax, Nova Scotia, and Moncton, New Brunswick. Most of the presentations were in the smaller cities and towns, although Philadelphia, Boston, Worcester, and Springfield were included. Usually the skit was exhibited in motion picture theatres. From April, 1925, until August 8, 1939, when this suit was brought, the plaintiffs "did nothing by way of exhibition or otherwise to inform the public of the existence of the playlet 'Million Dollar Legs,' and there was no evidence that others exhibited it to the public." The plaintiffs have not engaged together in the production or exhibition of shows since 1926. Coleman continued in business until 1929, and apparently neither of the plaintiffs was in the show business when this suit was brought. In the early spring of 1939, however, the plaintiffs "were considering the advisability" of producing a comedy to last from two to two and a half hours to be built around the skit and to be called by the same name. This plan was abandoned when the plaintiffs heard of the defendants' 1939 picture of the same name hereinafter referred to.

In 1932, and again in 1939, the defendant Paramount Pictures, Inc., produced, and the other defendants were concerned in distributing, a motion picture named "Million Dollar Legs." An officer of Paramount "thought up" the title for the first picture without knowledge of its previous use. Neither picture bore any resemblance to the plaintiffs' skit or made any use of the plaintiffs' idea. The 1932 picture featured the Olympic games, then being held, and showed runners at the games. The 1939 picture included a horse race. The master characterizes the name as a misnomer as applied to either picture and finds that it was adopted only because it had "box office appeal." Two attorneys employed in behalf of Paramount reported in 1932 and again in 1939 that a search revealed the plaintiffs' copyright, but that they found no evidence that the plaintiffs' skit had been exhibited to the public, and that the title was available for use. Paramount knew, however, that the search might not disclose "localized productions," and knew that it was "taking a risk." An investigation

would have disclosed that the plaintiffs were well known in theatrical circles in New York and Boston, but for "business reasons" Paramount intentionally omitted to make contact with them. The 1932 picture was exhibited in six thousand five hundred twenty-eight theatres throughout the United States and Canada over a period of several years, including seventy-three theatres in metropolitan Boston, and was exhibited in twenty-four foreign countries. It was reviewed in several magazines of national distribution. Except for the identity of title the master finds no evidence that any of the advertising or publicity given this picture "was such as to lead any of the general public who might have seen the complainants' skit in 1924–1925 to believe that the picture was based upon, or in any way related to, the skit." The plaintiffs, who lived in Boston, "had little or no interest in motion pictures" and were not aware of the production of the 1932 picture.

The 1939 picture had, up to the time of the hearings before the master, been exhibited in seven thousand nine hundred ninety-five theatres in the United States, including the territory in which the plaintiffs' skit had been exhibited fourteen years before. The plaintiffs learned in May, 1939, that Paramount was planning to produce a motion picture entitled "Million Dollar Legs," but delayed action "in good faith" to ascertain whether the picture would actually be produced and released under that title. Paramount copyrighted this picture under the name "Million Dollar Legs" on July 14, 1939, and released it to the public on the same day. Under date of July 17 counsel for the plaintiffs notified the defendants by letter of the plaintiffs' claims. Paramount had incurred a substantial expense for production and advertising, and the defendants continued to exhibit the picture. The master reports a single instance in which an actor entered a theatre in the belief that the defendants' 1939 picture was connected with the plaintiffs' skit, but reports that this was the only direct evidence of confusion and that the actor would be more likely to recall the skit and its title than would an ordinary member of the public. The master found, as a conclusion

from the facts hereinbefore stated, that during the period while the plaintiffs' skit was being used from March, 1924, until April, 1925, their title "Million Dollar Legs" acquired and retained a secondary meaning, so that it became "associated and identified" with the plaintiffs' skit in the localities where it was shown, and that this continued, "not particularly affected by lapse of time" until Paramount produced its pictures in 1932 and in 1939. He also found (not stated as a conclusion from other findings) that by reason of the extensive exhibition of Paramount's 1932 picture, the title "Million Dollar Legs" acquired a secondary meaning as associated with that picture, so that the title had two secondary meanings which were "parallel and coexistent."

Much of the argument has been devoted to the question whether the master's subsidiary findings support his conclusion resting solely upon them that the words "Million Dollar Legs" had acquired a secondary meaning as indicating to the public the plaintiffs' skit. We prefer to approach the case from a slightly different angle and to decide it upon the realities as disclosed by the subsidiary findings rather than to run the risk of overemphasis upon a formula of words more closely appropriate to the branding of merchandise than to the entitling of a book, playlet or skit. Upon the subsidiary findings we are convinced that the plaintiffs have failed to prove any appreciable interference with any substantial property right which they possessed by reason of either of the defendants' motion pictures.

Of course those of the plaintiffs' patrons who saw the name of the skit on a program or heard it announced by an announcer would for the time being associate the name with the skit. A few might remember the name for a while. But in *Ott* v. *Keith Massachusetts Corp.* 309 Mass. 185, at page 186, a case in many respects strikingly similar to the present case, we held, with citation of the authorities, that "Whether a book or play is copyrighted or not, neither the author nor the proprietor has any property right in the title entitling him to the exclusive use of it." The defendants did not plagiarize the plaintiffs' work or pirate any of

their ideas. The defendants merely conceived and used the same title for productions entirely different from any the plaintiffs had put out. The defendants did not deceive the public into the belief that they were to see the plaintiffs' skit or that they were seeing motion pictures produced by the plaintiffs or derived from the plaintiffs' production. "Million Dollar Legs" had never been employed or advertised by the plaintiffs as the title of their performance. They had advertised other titles for their performance as a whole and for their various revues. When they brought this name to the attention of the public at all it was only as designating a single act in a variety show of the type which prevailed in the nineteen twenties before the talking pictures were generally adopted. This use of the name resembled the heading of a chapter in a book rather than the title of the book itself. It seems to us to have been casual and unlikely to make a permanent impression upon many people. Such publicity as the name acquired in this way was like the "fugitive publicity" of a magazine to which reference is made in *International Film Service Co. Inc.* v. *Associated Producers, Inc.* 273 Fed. 585, 587. In the absence of further findings the single instance of the actor must be regarded as exceptional. The defendants did not appropriate to themselves advertising, reputation, or good will belonging to the plaintiffs. The plaintiffs' skit had never been advertised by name outside the theatre and had not been shown for seven years when the defendants' 1932 picture came out. Fourteen years had elapsed when their 1939 picture came out. It does not appear that the defendants did anything to injure the reputation of the plaintiffs or of their product. The defendants are not shown to have made profit by using anything of value belonging to the plaintiffs or to have caused the plaintiffs loss. We do not find here present any of the recognized elements of so called unfair competition. *Ott* v. *Keith Massachusetts Corp.* 309 Mass. 185. *Manners* v. *Triangle Film Corp.* 247 Fed. 301. *Beech-Nut Packing Co.* v. *P. Lorillard Co.* 7 Fed. (2d) 967. *Collins* v. *Metro-Goldwyn Pictures Corp.* 25 Fed. Sup. 781. *Economy Food Products*

*Co.* v. *Economy Grocery Stores Corp.* 281 Mass. 57. *Jenney Manuf. Co.* v. *Leader Filling Stations Corp.* 291 Mass. 394. *Jackman* v. *Calvert-Distillers Corp. of Massachusetts,* 306 Mass. 423. See *Underhill* v. *Schenck,* 238 N. Y. 7, 21. Compare *Warner Bros. Pictures, Inc.* v. *Majestic Pictures Corp.* 70 Fed. (2d) 310.

In our opinion the judge should have ruled that no case had been made out. A decree is to be entered dismissing the bill with costs.

*Ordered accordingly.*