HARVEY G. SCHLEIFSTEIN & another, executors, *vs.*
MINNIE B. GREENSTEIN & others.[1]

Suffolk.   October 17, 1979. — March 7, 1980.

Present: GREANEY, PERRETTA, & DREBEN, JJ.

*Fiduciary. Gift. Practice, Civil,* Master:   report of evidence, Counsel
fees.   *Trust,* Savings bank account.

In an action by the daughter of a testatrix against another daughter and
the latter's husband claiming that the defendants had wrongfully
diverted property of the estate into their own hands, there was suffi-
cient evidence to warrant a finding that, although the defendants en-
joyed a close personal relationship with the testatrix and the husband
did some accounting work for her, they did not control or manage her
finances or business, and hence there was no fiduciary relationship be-
tween the defendants and the testatrix. [348-349]

The fact that defendants to an action for wrongful diversion of the prop-
erty of an estate refused to produce documents pursuant to discovery
requests and falsely claimed they did not have the documents but
subsequently produced them did not require that their entire
testimony be summarily rejected. [349-350]

In an action for wrongful diversion of the property of an estate, there was
sufficient evidence to warrant a finding that a $10,000 check to one of
the defendants from the testatrix while she was living was a gift in
acknowledgement of the defendant's role in the sale of one of the
testatrix's properties even though the defendant did not include the
money on his income tax returns or on the testatrix's gift tax return
which the defendant prepared. [350-351]

In a case heard by a master, the judge did not abuse his discretion in deny-
ing the plaintiff's motion to confirm the master's report or her motion
to recommit a supplemental report for purpose of oral arguments on
its contents. [351-352]

In a case heard by a master, the plaintiff was not prejudiced by the fact
that the master improperly appended portions of the transcript to his sum-
maries of the evidence where the judge noted the impropriety and did not
rely on the transcripts in reviewing the master's findings. [352-353]

    [1] Max B. Greenstein and Walter G. Dimmock, administrator with the
will annexed of the estate of Sarah Cherry.   Dimmock filed a notice of ap-
peal but took no further action, and he is not a party to this appeal.

In an action for wrongful diversion of the property of an estate, the judge did not abuse his discretion in denying the plaintiff's motion for counsel fees and expenses even though she had recovered assets for the estate. [353]

In an action for wrongful diversion of the property of an estate, there was sufficient evidence to warrant findings that the testatrix had not intended to establish a trust when she opened a checking account as trustee for her daughter and that the estate, not the daughter, was entitled to the funds which remained in the account at the time of the testatrix's death. [353-355]

Evidence that a testatrix had established, with her daughter, joint accounts consisting of the testatrix's funds only, from which the testatrix alone made withdrawals, and that she had told her daughter, and implied to a tenant, that the accounts would belong to the daughter upon the testatrix's death was sufficient to warrant a finding that the testatrix had created a joint tenancy with a reservation of the right to withdraw the funds and to revoke the tenancy. [355]

In an action for wrongful diversion of the property of an estate, the master's general conclusions that the defendants were not dishonest in their treatment of the testatrix's funds and had not misappropriated any of her money were not inconsistent with a finding that certain bearer bonds purchased by the testatrix shortly before her death were not gifts to the defendants but property of the estate. [356]

BILL IN EQUITY filed in the Superior Court on March 28, 1972.

The suit was heard by *Garrity*, J., on a master's report.

*Benjamin Goldman (Allan G. Zelman* with him) for the plaintiffs.

*Alfred Sigel* for Minnie B. Greenstein & another.

PERRETTA, J. Sarah Cherry died testate on July 14, 1970, survived by her three daughters, Pearl R. Schleifstein,[2] Minnie B. Greenstein, and Doris E. Weiner.[3] Sarah had ex-

---

[2] After this suit was commenced in 1972, Pearl married, and the complaint was amended to reflect her assumption of her marital name, Pearl R. Fine. Pearl died on March 14, 1979, and her two executors, Sybil Schleifstein Kliman and Harvey G. Schleifstein, were substituted as the plaintiffs in this appeal. For purposes of clarity we shall refer to this decedent as "the plaintiff" or "Pearl."

[3] Doris has persistently refused to participate in this litigation, and she is not a party to this action.

ecuted her will in 1957, directing that her estate be divided among her daughters equally, to "share and share alike." The defendant Dimmock, an attorney, was named as administrator. Pearl ordered Dimmock, as administrator, to initiate a suit against Minnie and her husband Max, claiming that they had wrongfully diverted property of the estate into their own hands. Because Dimmock had represented Minnie and Doris in the past, he refused to do so. Pearl then commenced this action in the Superior Court pursuant to G. L. c. 230, § 5,[4] and it was referred to a master who was not to report the evidence. The judge modified the master's report and entered a judgment from which Pearl appeals, and Minnie and Max cross-appeal. We affirm the judgment.

It serves no purpose to recite in detail the procedural morass into which this case fell after the master filed his report in 1974. It is sufficient to note that throughout the next four years the parties filed objections to the reports, requests for summaries of the evidence, motions to recommit and motions to confirm the report. Ultimately, in 1978, a judge was specially assigned for the specific purpose of rendering a final decision. He properly disregarded the portions of transcript which the master had appended to his summaries of the evidence, *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 185-190 (1976), and confined his review of the report to a determination whether the master's findings were "mutually inconsistent, contradictory, plainly wrong

---

[4] General Laws c. 230, § 5, as in effect prior to St. 1973, c. 1114, § 145, provided: "It shall be unnecessary to remove an executor or administrator in order that an action or suit to enforce a claim in favor of the estate may be brought by an administrator to be appointed in his place, when he refuses to bring such action or suit at the request of an heir, legatee or creditor, or is unable to do so by reason of his interest or otherwise, but an heir, legatee or creditor having an interest in the enforcement of any such claim may bring a suit in equity to enforce it for the benefit of the estate in like circumstances and in like manner as a person beneficially interested in a trust fund may bring a suit to enforce a claim in favor of such fund, and in case of such a suit in respect to real estate, it shall not be an obstacle to the suit that a license to sell it has not been obtained by the executor or administrator."

or vitiated in view of the controlling law." *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659, 660 (1975), quoting from *Selectmen of Hatfield* v. *Garvey,* 362 Mass. 821, 825 (1973). The judge made findings and rulings which we review for this same purpose as well as to determine whether they are supported by the master's report and to correct any errors of law. We relate the facts from the findings by which we are bound.

Pearl, Minnie, and Doris were born to Sarah during her first marriage. She subsequently married Israel Cherry, and she and Israel worked together in their real estate business. Pearl married and resided in New York until 1965, when her husband died and she returned to Massachusetts. Minnie married Max, an accountant, and they lived with Sarah and Israel for two years. Max assisted them in their real estate dealings, and Minnie tended the home. Israel died in 1949, and Sarah acquired three pieces of realty from Israel's estate after contesting his will. She engaged in the real estate business until her death. Sarah lived alone in an apartment which she owned, but Minnie and Max always lived near her during these years and assisted her both personally and professionally. Max handled the major repairs, leases, contracts, and insurance pertaining to her realty, which she reduced to one building in 1964. He and his partner prepared her tax returns, and Max kept her books and records, acting as her advisor, for all of which he received an annual $500 fee. In addition, he allowed Sarah the free use of his office and utilities for her business. While Max had knowledge of Sarah's business affairs, he did not control her books or money. Minnie, due to Sarah's physical condition, acted as a chauffeur for Sarah. Sarah purchased cars in Minnie's name for this express purpose. Whenever Sarah was ill or unable to go about her business, Minnie took care of her. She did Sarah's shopping, showed Sarah's apartments to prospective tenants, placed advertisements for her mother's rentals, and, in general, she was at Sarah's disposal.

1. *Pearl's Appeal.*

The recurrent claim underlying Pearl's numerous allegations is that Minnie and Max exploited this personal relationship with Sarah for the purpose of thwarting Sarah's express intention to leave her estate to her three daughters in equal shares. She argues that Max, as Sarah's accountant, was her fiduciary as matter of law, and that Minnie too was her fiduciary "by a parity of reasoning" and the evidence presented to the master. Thus, she concludes, it was their burden to show that Sarah had made a gift of the property which she transferred to them during her lifetime. The master found that no fiduciary relationship existed between Sarah and Minnie and Max; this finding was adopted by the judge. The existence of a fiduciary relationship is generally a factual determination. *Hawkes* v. *Lackey,* 207 Mass. 424, 431-433 (1911). *Cann* v. *Barry,* 293 Mass. 313, 317 (1936). *Broomfield* v. *Kosow,* 349 Mass. 749, 755 (1965). The cases relied upon by Pearl in support of her allegation of the relationship do not hold to the contrary.[5] Such a relationship does not arise solely by virtue of close familial or amiable ties. *Ranicar* v. *Goodwin,* 326 Mass. 710, 713 (1951). *Meskell* v. *Meskell,* 355 Mass. 148, 151-152 (1969). *Kelly* v. *Kelly,* 358 Mass. 154, 156-157 (1970). *Dupree* v. *Gipstein,* 2 Mass. App. Ct. 769, 772 (1975). See Bogert, Trusts and Trustees § 482, at 300-311 (2d ed. rev. 1978). It is the function of the fact finder to examine the relative business acumens of the parties to determine if the less knowledgeable person trusted and confided in the more skilled individual. *Kosow, supra,* 349 Mass. at 755-757. The master made his factual determinations, and the judge examined his findings. All that remains for us to decide on this issue is whether this finding is clearly erroneous. The judge adopted the master's findings that Sarah was a competent entrepreneur who controlled the management of her several

---

[5] *Cafritz* v. *Corporation Audit Co.,* 60 F.Supp. 627 (D.D.C. 1945). *Dantzler Lumber Co.* v. *Columbia Cas. Co.,* 115 Fla. 541 (1934). *Squyres* v. *Christian,* 242 S.W.2d 786 (Tex. Civ. App. 1951). *Croisant* v. *Watrud,* 248 Or. 234 (1967).

rental properties and that she was aware of the financial condition and implications of her business ventures. She was well experienced in her business, which was reduced to one property after 1964. As she advanced in age she became physically infirm due to failing eyesight and impaired mobility. Her ailments required, or allowed, Minnie and Max to perform physical services for her which facilitated her accomplishment of those financial tasks necessary to the maintenance and day-to-day functioning of her business. Minnie and Max were easily able to do her banking because of joint accounts with her. Max furnished her with free office space where she conducted her business and kept her records. Although Max did accounting work for Sarah for which he received a nominal fee, he neither did all of her accounting or bookkeeping, nor was he a conduit of her funds. Sarah signed all the checks, reviewed the bank statements, and studied the annual statements and records prepared by Max. While Minnie and Max enjoyed a close personal relationship with Sarah, they did not control or manage her finances or business. These subsidiary determinations warrant a finding that neither Minnie nor Max was Sarah's fiduciary.[6] See *Cranwell* v. *Oglesby*, 299 Mass. 148, 152-153 (1937); *Snow* v. *Merchants Natl. Bank of New Bedford*, 309 Mass. 354, 360-361 (1941); *Salter* v. *Beal*, 321 Mass. 105, 108-109 (1947); *Kosow*, 349 Mass. at 755-757.

Before dealing with these contested transfers individually, we dispose of one additional general allegation which Pearl makes, and that is that over the twenty-year period during which Minnie and Max assisted Sarah they misappropriated $900,000 from her. To prove this claim before the master, Pearl elicited the testimony of an accountant who had been provided with only a limited number of

[6] Because of our holding on this issue we need not consider Pearl's contention that as fiduciaries Minnie and Max had the burden of showing that every disputed transfer of property to them by Sarah was by way of gift. Cf. *Shaw* v. *Harding*, 306 Mass. 441, 447 (1940); *Warsofsky* v. *Sherman*, 326 Mass. 290, 293 (1950); *Samia* v. *Central Oil Co.*, 339 Mass. 101, 126-127 (1959).

Sarah's records. He did not have access to all her records and tax returns because Minnie and Max refused to comply with discovery requests. The accountant testified that based upon his study of these documents and his reliance on the "net worth method" of determining income, he was of the opinion that the books reflected a loss of nearly one million dollars from Sarah's holdings. The master considered but did not accept this testimony because it was based upon a restricted review of Sarah's records. Neither the master nor the judge ignored Minnie's and Max's refusals to produce the requested documents; rather, the master made detailed subsidiary determinations on this point, and he found that Minnie and Max eventually furnished him with all the records and tax returns necessary for a resolution of this claim of misappropriation. When Minnie and Max finally produced these documents, the master reviewed them and made subsidiary findings in support of his general determination that Sarah's entire estate consisted of all her reported assets at their listed and appraised values and that there had been no misappropriation. Pearl seeks to avoid this finding on the sole basis that Minnie's and Max's refusals were calculated attempts at deception which made them unworthy of belief and required that the master reject their testimony. However, it is settled that deliberate attempts to deceive do not force a fact finder to reject summarily the entire testimony of a recalcitrant witness. Such attempts may be the basis for permissible inferences, but they do not affirmatively prove the ultimate issue. *D'Arcangelo* v. *Tartar*, 265 Mass. 350, 352 (1928). *Sheehan* v. *Goriansky*, 317 Mass. 10, 16-17 (1944). *Hillery* v. *Hillery*, 342 Mass. 371, 375 (1961). Pearl also claims that Minnie's and Max's deceptions render them liable to the estate in the amount of $900,000. The short answer to this is that there can be no liability for misappropriated funds unless the funds were in fact misappropriated.

In March of 1965, Max received a $10,000 check from Sarah. He testified before the master that this money was a gift from Sarah in acknowledgement of the role he played in

the sale of one of her properties. The sale yielded over one half million dollars. The master made subsidiary findings that Max was not the broker in that sale, that the money did not represent a broker's fee, that he had not obtained the check from Sarah through coercion or fraud, and that it was a gift from Sarah to Max. He disregarded the evidence that Max did not include this money on his income tax returns or on Sarah's gift tax return. The judge indicated that the master's findings on this particular issue were sparse. However, he reviewed those findings as well as the master's detailed findings on Max's relationship with Sarah in general as related in the beginning of this opinion, and he concluded that the findings were consistent with and supportive of an inference of a gift from Sarah to Max. There was no error in the judge's adoption of the master's general finding. See *Bills* v. *Nunno,* 4 Mass. App. Ct. 279, 281-283 (1976). Pearl bases her challenge to this finding on Max's tax treatment of the money. She reasons that because Max did not report the money on his income tax returns or Sarah's gift tax return, it was neither a broker's fee nor a gift, and it is money now due the estate. The tax treatment of this transaction is not dispositive of the issue. See *Koufman* v. *New England Merchants Natl. Bank of Boston, ante* 40, 44-45 (1980). The subsidiary findings show that all the necessary elements of a gift existed at the time of Sarah's transfer of the money to Max. "In order to effect a completed parol gift there must be a settled donative intention on the part of the donor, together with an actual or symbolic delivery of the subject matter of the gift to the donee or someone in his behalf in such manner as completely to transfer the dominion and control of it in the lifetime of the donor." *Kobrosky* v. *Crystal,* 332 Mass. 452, 460 (1955). Compare *Silverman* v. *A. & L. Heel Corp.,* 353 Mass. 108, 110 (1967).

Pearl next presses claims of procedural error. The master filed his report on April 25, 1974. Pearl filed objections to the report and moved to confirm it. The defendants moved to recommit the case to the master or to expunge various

findings contained in the report.   The judge denied Pearl's
motion and partially allowed the defendants' request by
ordering the master to expand his findings so that he could
"properly and fairly determine whether the subsidiary find-
ings were correct" and so that he could decide questions of
law.   There was no error in denying Pearl's motion.   The
judge's actions were well within his sphere of discretion.
*Epstein* v. *Epstein,* 287 Mass. 248, 254 (1934).   *DiMare* v.
*Capaldi,* 336 Mass. 497, 501 (1957).   When the master filed
his supplemental report, Pearl requested recommittal on
eight issues, only four of which remain, due to various
waivers made during the progression of this litigation.   The
judge denied her motion, but Pearl claimed an appeal and
preserved these issues for our review.   *Fusaro* v. *Murray,*
300 Mass. 229, 230-231 (1938).   *Orth* v. *Paramount·Pic-
tures, Inc.,* 311 Mass. 580, 581-582 (1942).   *Vincent* v.
*Plecker,* 319 Mass. 560, 562-563 (1946).   Pearl insists that
she had a right to oral argument before the master concern-
ing the contents of his draft supplemental report.   See Rule
90 of the Superior Court (1954), and its successor, Rule
49(7) of the Superior Court (1974).   We need not consider
whether such a right exists on recommittal because even
were we to assume that such a hearing was required, we
have no doubt that the failure to hold that hearing does not
here constitute error of such magnitude that we should now
order recommittal for that purpose.   Recommittal was
ordered in the first instance after argument before the judge
concerning the merits and limits of his order.   The master
invited and Pearl submitted written suggestions as to the
contents of the supplemental report.   After the report was
filed she urged the judge to recommit the matter again for
purpose of oral argument on the contents of the report.   We
see no inherent unfairness, arbitrariness, or abuse of discre-
tion in the judge's refusal to do so.

Pearl is correct in her contention that the master im-
properly appended portions of the transcript to his sum-
maries of the evidence.   The order of reference did not state
that the evidence was to be reported.   See *Michelson,* 4

Mass. App. Ct. at 185-187. Pearl has no cause for complaint, however, because the judge noted this impropriety, and he did not rely on the transcripts in reviewing the master's findings. We too have ignored them. Compare *Miller* v. *Winshall, ante* 312 (1980).

The judge denied Pearl's motion for counsel fees and expenses, and Pearl here asserts that she is entitled to them because she has recovered assets for the estate. This is a matter left to the discretion of the judge, and we perceive no abuse of that discretion in the denial of Pearl's request for compensation and costs. *Commissioner of Ins.* v. *Massachusetts Acc. Co.*, 318 Mass. 238 (1945). Pearl's remaining contentions concerning certain bank accounts and bonds are disposed of on the defendants' cross-appeals.

2. *Minnie's and Max's Cross-Appeals.*

Minnie claims that certain funds deposited in a checking account at the United States Trust Company were deposited by Sarah in trust for Minnie and that the estate is not entitled to the balance of these funds which remained at the time of Sarah's death. Sarah opened the account in 1949 by presenting two documents to the bank. One was a letter signed by Sarah in which she stated that the account "opened by me today entitled Sarah Cherry, Trustee, is of funds belonging to the said Minnie B. Greenstein, and all deposits to this account and all withdrawals from this account by me will be for her use and benefit." The second document was a letter from Minnie to the bank in which she authorized it to accept funds for her benefit. All parties to the litigation have proceeded on the assumption that Sarah opened this account with her funds and that she is the settlor of the trust. Pearl presented evidence to the master to show that the account was established by Sarah for the purpose of protecting her assets. The master, based upon his subsidiary findings, found that Sarah, in opening this account, did not intend to establish a trust. The judge accepted these findings and ordered that the balance of the account be distributed under the terms of Sarah's will as part of her estate.

There was no error. "It is so common for an owner of personalty to put the apparent title in his own name as trustee for another who furnishes no consideration, without any intent to create a genuine present interest in that other, or to surrender any part of his dominion over the property, that the law is skeptical of the reality of a trust so declared." *O'Hara* v. *O'Hara,* 291 Mass. 75, 77 (1935). See *Reagan* v. *Phillips,* 345 Mass. 387, 388-389 (1963). Cf. *Blanchette* v. *Blanchette,* 362 Mass. 518, 523-524 (1972). While this initial skepticism is overcome to a large extent where the beneficiary has been notified of the creation of the trust, see *Aronian* v. *Asadoorian,* 315 Mass. 274, 277 (1943), *Berger* v. *Berger,* 333 Mass. 540, 544 (1956), *Mikshis* v. *Palionis,* 345 Mass. 316, 318 (1963), notice is but one factor to consider in determining the settlor's intention. See 1 Scott, Trusts §§ 58.1-58.4 (3d ed. 1967). The very activity of this account belies any intention by Sarah to transfer any rights in that account to Minnie. The master made subsidiary findings that: Minnie never deposited any of her own funds in that account, Minnie never signed any checks on that account, Minnie never complained to Sarah that Sarah was using Minnie's funds when Sarah drew checks on that account, Sarah used that account for her business and personal needs, including gifts to her children and grandchildren, this account was the only checking account Sarah used, all rental checks collected by Sarah were deposited in that account, and the checkbooks relating to the account were at Sarah's home, as well as her office and Minnie's house. The master inferred and further found on the basis of these facts that Sarah knew that a trustee account would afford her some protection against attachments. Minnie argues that because Sarah owned no realty at the time she opened her account, the master's inference is "indefensible on the record." As pointed out by the judge in adopting the master's inference, "[i]t is proper for the master to infer that Sarah could have reasonably anticipated taking title to certain, though not then determined, properties under her husband's will because as Special Administrator of his estate she

was in a position to know the nature of his will." The subsidiary findings are not contradictory, and they are sufficient to support the general finding that the account was created to provide Sarah with protection against attachment of her assets. See *Burns* v. *Paquin*, 345 Mass. 329 (1963); *Miles* v. *Caples*, 362 Mass. 107 (1972); *Krasner* v. *Krasner*, 362 Mass. 186 (1972); *Caron* v. *Wadas*, 1 Mass. App. Ct. 651 (1974).

Sarah also established joint accounts with Minnie at the Union Savings Bank and the Workingmen's Cooperative Bank in 1959 and 1964, respectively. The master made subsidiary findings which establish that these accounts consisted of Sarah's funds only, that she paid the taxes on the interest earned by these accounts and that she alone made withdrawals from them. However, the master also found that Sarah told Minnie that, upon her (Sarah's) death, the accounts would belong to Minnie; he further found that in 1970 Sarah told a tenant that she did not know what she would do without Minnie, that she had bank books in joint names, and that if anything happened to her, she wished Minnie to be taken care of. Based upon these findings the master concluded that the accounts were not gifts to Minnie, but, rather, they were put in joint names for Sarah's convenience. In his supplemental report the master stated that his finding that Sarah never intended a gift of these accounts to Minnie was based solely on his subsidiary findings. The judge found the master's conclusions to be inconsistent with his findings, and he struck them from the report and drew his own conclusions. He was free to do this. *Bills* v. *Nunno*, 4 Mass. App. Ct. at 283-284. He concluded that the findings did not show that Sarah had established these accounts "solely for her own convenience." The judge's conclusion that the subsidiary findings were consistent with Sarah's creation of joint tenancy with a reservation of the right to withdraw the funds and to revoke the tenancy was not clearly erroneous. See *Malone* v. *Walsh*, 315 Mass. 484, 490-491 (1944); *Blanchette*, 362 Mass. at 523, and cases cited therein at n.1.

Minnie and Max dispute the master's findings relating to money withdrawn by Sarah from the Volunteer Cooperative Bank three months before her death and relative to Connecticut bonds in bearer form. In each instance they contend these items were gifts to them and that they are not property of the estate. The master's subsidiary findings on these claims turn on issues of credibility, and the judge correctly left them undisturbed. *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977). Minnie and Max point to the master's general conclusions that they were not dishonest in their treatment of Sarah's funds, and they did not misappropriate any of her money. However, there are no inconsistencies or contradictions between the subsidiary and general findings as they allege; those general findings relate to Pearl's demand that they account for a million dollars she believed to be missing from Sarah's estate and not to the withdrawals or bonds.

The judgment is affirmed, and no party is to have the costs of this appeal.

*Judgment affirmed.*