Feeley, Timothy Q., J.
This is an action for declaratory judgment brought by the Executrixes of the Estate of Peter J. Fiumara (“Fiumara”). The defendants are the five surviving children of Fiumara and three of Fiumara’s grandchildren (the “grandchildren”) who survived Fiumara’s sixth child at the time of Fiumara’s death. The executrixes, who are also two of the surviving children and are named as defendants in their personal capacities, have attempted to marshal the assets of the estate and distribute those assets in accordance with Fiumara’s will.[1] This action, by means of plaintiffs’ first amended complaint [D. 39], seeks a declaration, in part, that certain properties that were placed in a particular trust by Fiumara are actually part of Fiumara’s estate and are not validly held by and in the trust.
In more detail, the executrixes ask this court to declare:
(1) the Hyde Avenue Realty Trust void as it was a “sham” designed merely to shield Fiumara’s assets from creditors and never actually functioned as a trust;
(2) that certain Trust Property was at all times under the exclusive control and for the exclusive benefit of Fiumara, and not the Life Beneficiary nor any of the other beneficiaries identified in the Trust documents;
(3) each deed conveying the Trust Property to the Trust is null and void and of no legal effect;
(4) each of certain parcels of real properly constituting the Trust Property is properly of the Estate;
(5) the conveyances of certain real property (condominium units) were gifts and are not part of the Estate or the Trust.
To accomplish their purpose in this action, the executrixes have named as defendants all of the remainder beneficiaries of the trust. None of the five surviving children of Fiumara contest the declaration sought by the executrixes. It is only the grandchildren, who take nothing under the will but are one-sixth beneficiaries under the trust, who contest the requested declaration. This case also involves an unjust enrichment claim by the executrixes against the grandchildren, and claims by the grandchildren against the trustee of the trust (who is also one of the two plaintiff executrixes) and two of the grandchildren’s co-defendants. [D. 39, 40, 42.] By order of this court, separate trials of the various claims were ordered, with the first trial limited to the executrixes’ declaratory judgment action, with the trial of any claims brought by the executrixes and the grandchildren to be scheduled thereafter, if those claims survive the plaintiffs’ declaratory judgment action.[2] [D. 37.] A non-jury trial was conducted by the court between February 1 and February 8, 2011. Post-trial briefing was scheduled, and memoranda were received by the court on March 17, 2011. [D. 58, 59.] Closing arguments were heard by the court on March 30, 2011.
The determinative issue for this court to decide is whether Fiumara created and established a valid trust in 1986, so that properties thereafter transferred into and held by the trust at the time of Fiumara’s death remain subject to distribution to the defendant remainder beneficiaries in accordance with the terms of *456 the trust. If that is not the case, then the properties held in and by the trust at the time of Fiumara’s death (with an agreed-upon exception) are properly part of Fiumara’s estate, to be distributed in accordance with the terms of Fiumara’s will. The issue is vigorously contested, but ultimately is controlled by whether it was Fiumara’s intention in 1986 to create and establish a valid trust that would separate legal and equitable interests in the properties deeded into the trust between the trustee (legal interest) and the beneficiaries (equitable interest). As is clear from the facts found by the court, and the discussion below that follows the factual findings, the issue of Fiumara’s intention is not close. Fiumara never intended to establish a trust that deprived him of full control of the legal and equitable interests of the properties deeded into the trust. Accordingly, this court finds in favor of the executrixes in their declaratory judgment action and declares, in part, that certain properties in the trust at the time of Fiumara’s death are part of the estate of Peter J. Fiumara.
BACKGROUND
Grace Fiumara (“Grace”) was bom on November 23, 1921, in New York. She relocated with her family to Boston when she was seven or eight years old. She went as far as the seventh or eighth grade in school before marrying Peter J. Fiumara, Sr. (“Fiumara”) when she was fifteen years old. Children quickly followed, six in all. Dolores was born in 1938, Peter J. Fiumara, Jr. (“Peter”) in 1940, Joanne in 1942, Rosemarie in 1944, Joseph in 1947, and Nina in 1950.[3] Grace was a stay-at-home mother and wife. She was never employed outside the home. She had no independent income outside her marriage to Fiumara. She died on October 23, 2000, at the age of seventy-eight.
Fiumara was born in Boston on September 25, 1918. His father died in the influenza epidemic of 1918-1919, five days after Fiumara was born. Fiumara left school in or after the eighth grade to help his mother support the family with her push cart fruit business in Boston. Fiumara stayed in the food business for nearly thirty years, until 1951-1952, establishing his business as a food broker under the name South Shore Fmit. In 1951, Fiumara and Grace purchased 35 Hyde Avenue, Newton, Massachusetts (“35 Hyde Avenue”), as their family home, where they lived throughout the remainder of their respective lives. Starting in the early 1950s and continuing until his death in 2005, Fiumara became engaged in a number of diverse business and property ventures.
In the early 1960s, Fiumara owned a bar/nightclub on Stuart Street in Boston called The Living Room, which his sons Peter and Joseph ran. The property was taken by eminent domain in 1973-1974. Thereafter, Fiumara operated another bar/nightclub in Boston called The Sugar Shack. That business lasted only a couple of years. In the mid to late 1970s, Fiumara bought the property at 604 Squire Road, Revere, and the Squire Lounge, a nude dancing club that operated at that location. The business itself was (and still is) owned and operated by Charger Investments, Inc. (“Charger”), of which Fiumara was the principal owner until his death. Fiumara’s son Joseph has been employed at the Squire Lounge for over thirty years, as the night manager. Also in the 1970s, Fiumara bought the building and restaurant at 75 Chestnut Street, in the Beacon Hill section of Boston. He owned the property and operated the restaurant until 1986. Prior to that date, he mortgaged the property in order to help finance his ventures in the food business. When those ventures went bad in 1986, the bank took 75 Chestnut Street under the terms of the mortgage. From 1997 or 1998 until his death in 2005, Fiumara was at least a part owner of D&B, Inc., which operated the Golden Banana on Route 1 North in Peabody.
From the early 1950s until at least the late 1980s, Fiumara was involved in loaning money through Brunswick Finance Corp. In the 1970s he was a partner in an oil heating business on the North Shore. From a date that was not clear in the record until the early 1980s, Fiumara had an interest in a sign company in Chelsea.
Fiumara also started accumulating real estate. He bought the property at 604 Squire Road where the Squire was located, and an adjacent property at 770 Washington Street, Revere. He bought land at 571 Revere Street, Revere, and formed 571 Revere Street, Inc. to hold liquor and innkeeper’s licenses, and to collect and receive any rents for the property. For a period in the late 1970s and early 1980s, Peter operated a club called Key Largo at 571 Revere Street. However, it provided live entertainment that was losing popularity at that time, and Key Largo closed after a few years. Eventually, Fiumara rented/leased 571 Revere Street (and the liquor/innkeeper’s licenses) to a bar/club called The Cove, which still operates at that location. Fiumara bought commercial property in the produce section of Chelsea at 85 Market Street. During the 1980s, he was also involved in the development of the Sheffield Heights Condominiums in Saugus and received two condominium units for his investment/development activity. He also bought a vacant parcel of property at 239 Oakwood Avenue in Revere.
A. The Origins of the Hyde Avenue Trust
It was the food business that led Fiumara to the brink of financial ruin in the mid-1980s. J&R Veal Company was a family-run meat business which distributed cut veal to restaurant customers. At various times, Rosemarie, Nina, Joseph, and one of Dolores’s sons worked at the company. Grace never worked outside the house, and never had a role of any sort at any time in any of Fiumara’s businesses. In 1981, Fiumara became a 50% partner in Fulton Meat Packing Company. One or both meat companies tried to expand and became badly overextended. Fiumara was forced to mortgage his Beacon Hill property to help his *457 food businesses. In the late summer or early fall of 1986, all of Fiumara’s food businesses collapsed and closed. Rosemarie estimated that Fiumara might have lost as much as $5 million, maybe more.
The financial set-backs of 1986 had a profound effect on Fiumara. He became distraught at the thought of what had happened and that he might not be able to provide for his wife and their home in the future. He had lost a great deal of money and lost assets such as the Beacon Hill property to satisfy his own personal/business debts. He became convinced that he had to protect his assets in the future so they would always be available for him to provide for himself and his wife.
Fiumara chose Bernard Rome (“Rome”), a Boston attorney who lived in Newton a short distance from 35 Hyde Avenue, for the legal work he wanted performed. Fiumara’s own contact with Rome was not established by testimony at the trial, but it is clear that substantial contact between the two occurred. Additionally, Frank Green, a friend and consultant to Fiumara, Rosemarie, and Peter had one meeting with Rome at his Newton home. They discussed the issues that had led to Fiumara’s concerns and his interest in protecting his assets.
Rosemarie was the fourth of the siblings and turned forty-two in 1986. She is a college graduate and never married. She had employment in the field of medical education, spent time with Arthur D. Little Co., and worked at the family-run J&R Veal Co. from 1982 until it closed in 1986. Other than some of her college years and nine months when she worked for Arthur D. Little in its Washington office, Rosemarie lived with her parents at 35 Hyde Avenue from the time of their purchase of the home in 1951 until 1992.
After her presence at the initial meeting with Rome, Rosemarie does not recall any other communication with Rome until a meeting at his Boston office on November 14, 1986. She was instructed to attend the meeting by Fiumara. She met Fiumara and Grace at 35 Hyde Avenue and the three of them drove to Rome’s office. Fiumara told Rosemarie that he wanted his businesses and property to be protected, and that she was going to be the trustee and had to attend the meeting to sign some documents. Fiumara told her that she was the best of the children to be trustee, in part because she was not married and would not be exposed to problems that sometimes are caused by failed marriages and disputes about splitting marital property.
The meeting at Rome’s office was brief, no longer than fifteen minutes or so. Grace did not say anything, and asked no questions. Rome had a stack of papers before him and presented one or more signature pages for Rosemarie and Grace to sign. Included was the signature page for the Declaration ofTrust of The Hyde Avenue Realty Trust (the “Trust”). [Ex. 7.) Grace signed as “Settlor,” and Rosemarie signed, accepting her appointment as “Trustee” of the Trust. Rosemarie did not read the Declaration ofTrust, and was not provided a copy to do so, then, or upon leaving Rome’s office that day. No explanation of the Trust, or her responsibilities as Trustee, was given to Rosemarie at that time. Rome notarized Grace’s and Rosemarie’s signatures. Signed the same day at Rome’s office was a deed for 35 Hyde Avenue, transferring the property from Fiumara and Grace to Rosemarie (individually) for one dollar [Ex. 5]; a deed for 35 Hyde Avenue, transferring the property from Rosemarie to Fiumara and Grace, as tenants by the entirety, for one dollar [Ex. 6]; and a deed for 35 Hyde Avenue, transferring the property from Fiumara and Grace, as tenants by the entirety, to Rosemarie, as Trustee of the Trust, for one dollar. [Ex. 8.) The three deeds were recorded in the order referenced above, and the Declaration of Trust was recorded directly before the three deeds. Rosemarie understood at that time that 35 Hyde Avenue was the only property being placed into the Trust. However, three other properties were transferred by Fiumara to Rosemarie as Trustee on November 14, 1986, with Fiumara signing a single deed, notarized by Rome. The single deed transferred property at 571 Revere Street,[4] where The Cove operated, the vacant parcel of property at 239 Oakwood Avenue in Revere,[5] and the property at 604 Squire Road, where the Squire Lounge operated. [Ex. 16.) It was also recorded on November 14, 1986, at the Suffolk registry, as all three properties were located in Revere, Suffolk County. Rosemarie was unaware that any properties, other than 35 Hyde Avenue, were conveyed into the Trust by Fiumara on that date.[6]
B. The Declaration of Trust
The Trust declares that Grace, as “Settlor,” organizes and creates the Trust and transfers and causes to be transferred certain property to Rosemarie as ‘Trustee,” for the benefit of “beneficiaries hereinafter named.” The properties transferred simultaneously with the creation of the Trust were to be the initial “corpus” of the Trust, together with all income earned thereon and all future additions to the Trust.
Beneficiaries were named in the Trust as follows:
The entire net income of the Trust shall be paid to [Grace] as long as she shall live. Upon her death, the assets of the said Trust shall be divided equally among the said six children of [Grace and Fiumara], per stirpes. In the event that one of the six children should die without issue before [Grace], then the share of such deceased beneficiary shall be distributed among the surviving beneficiaries and their heirs in equal shares, per stirpes.
The Trust also required the Trustee to distribute the net income of the Trust as least once annually to the beneficiary who was then entitled to receive the said distribution. It also provided for the termination of the Trust upon the death of both Fiumara and Grace.
*458 The named defendants in this declaratory judgment action are the five surviving children of Fiumara and Grace, including Rosemarie and Nina, and the three children of the sixth sibling, Peter J. Fiumara, Jr., who died in 1989. All five surviving children of Fiumara and Grace testified. Excepting Rosemarie, not one child of Fiumara and Grace had any knowledge of the existence of the Trust, or his/her status as a remainder beneficiary prior to Fiumara’s death and the subsequent attempt to sell 35 Hyde Avenue to third parties. Peter’s three children testified, and not one had any knowledge of the existence of the Trust, or his/her status as a remainder beneficiary prior to Fiumara’s death and the subsequent attempt to sell 35 Hyde Avenue to third parties. This court also concludes, based on all of the evidence, that Grace also had no knowledge that she was the life beneficiary under the Trust, entitled to net income of the Trust on at least an annual basis.
The court finds that Fiumara conducted his business and financial affairs himself, without consultation with any members of his family, including Grace. According to Rosemarie, Fiumara ruled his finances and business affairs with an iron fist. According to Dolores, the oldest child/sibling, Fiumara’s business stuff was all private. According to Nina, as well as other siblings, Fiumara never discussed his financial, business, or estate affairs with any of them. Grace, like Rosemarie, was handed signature pages at Rome’s office on November 14, 1986, and directed where to sign. She had no questions, made no statements, did not read the Trust document at the lawyer’s office, and was not informed of her rights under the Trust at that meeting. Given the testimony of the five surviving children, this court concludes that Fiumara excluded Grace from his business and financial affairs as much as he did his children. From November 14, 1986 forward, Grace never raised any issue regarding the Trust or her status as beneficiary with Rosemarie, the Trustee of the Trust. The Trust never provided any money to Grace during her lifetime. However, Grace was well provided for by Fiumara, and never wanted for anything. Rosemarie never resigned as Trustee of the Trust.
C. Trust Properties 1. 35 Hyde Avenue, Newton
Prior to November 14, 1986, all expenses of 35 Hyde Avenue, including utilities, maintenance, upkeep, capital expenditures, and taxes were paid by Fiumara. Fiumara did not have a personal checking account. He paid his personal bills by cash or bank check, or occasionally he directed Rosemarie to issue her personal check and he thereafter reimbursed her. After 35 Hyde Avenue was placed in the Trust on November 14, 1986, nothing changed with respect to the payment of expenses for the property. Fiumara continued to pay bills in cash or by bank check, and occasionally had Rosemarie draw a check on her personal account, to be reimbursed by Fiumara. After November 14, 1986, until Grace died in 2000, Rosemarie and Grace never had a single discussion about the Trust. Grace never directed any inquiry about the Trust to Rosemarie, and Rosemarie never brought the subject up to her mother. This property was maintained as the primary residence of Fiumara and Grace until her death in October 2000, and thereafter as Fiumara’s primary residence until his death on July 4, 2005. It was sold by Rosemarie, as Trustee of the Trust, to unrelated third parties on July 20, 2007.
In early November 2001, Fiumara arranged a $500,000 equity line of credit from the Industrial Credit Union (“ICU”), secured by 35 Hyde Avenue. According to Roy Campagna (“Campagna”), President of the ICU, Fiumara was a long-time customer of the ICU. The revolving credit agreement (the “note”) was signed by Fiumara individually, and by Rosemarie, individually and as Trustee of the Trust. [Ex. 10.) A revolving credit mortgage secured the note with a mortgage on 35 Hyde Avenue. [Ex. 13.] Rosemarie, individually and as Trustee of the Trust, is the only signatory to the mortgage. She also signed a Request for Taxpayer Identification Number and Certification, which included her own social security number [Ex. 11], and aTrustee’s Certificate. [Ex. 12.] The certificate included Rosemarie’s statement that she, as trustee, had been authorized by all beneficiaries of the Trust to execute the necessary documents to effect the $500,000 home equity loan. That statement was not true. Rosemarie never consulted with or informed any beneficiary of the Trust about any of the transactions involving properties or commitments of the Trust. At that time, she was unaware of the identities of the actual beneficiaries of the Trust. She did not even know that she was a beneficiary. Rosemarie merely signed whatever Trust-related paperwork her father directed her to sign.
Fiumara’s history with the ICU went back thirty-five or more years. He knew Campagna’s father (who also worked at the ICU) from growing up together in the North End of Boston. Campagna approved the loan to Fiumara before learning, and before the ICU’s attorney learned, that 35 Hyde Avenue was held by Rosemarie, as Trustee of the Trust. As Campagna testified, the Trust was nothing more than a formality as far as the ICU was concerned, as the money was being lent by the ICU to Fiumara, based on Fiumara’s long history with the credit union. Campagna and Rosemarie never talked about the loan and mortgage. In fact, the application for the credit line, if dates are accurate, was actually approved by the ICU four days after the credit line note and mortgage were signed. [D. 14.] The application also reflects that there was no co-applicant for the loan.
Rosemarie first learned about the credit line from the ICU when Fiumara instructed, her to sign the necessary paperwork. She never had a discussion *459 before that time with Fiumara or any personnel of the ICU about the loan and the mortgage given by her on 35 Hyde Avenue securing the credit agreement. On June 20, 2007, Campagna signed a Discharge of Mortgage for the mortgage on 35 Hyde Avenue. [Ex. 14.] That was the same date that 35 Hyde Avenue was sold by Rosemarie as Trustee of the Trust to third parties. [Ex. 62.] Rosemarie never learned (at least during Fiumara’s lifetime) how much if anything of the $500,000 line of credit was drawn down and received by Fiumara. The Trust never received any funds from the ICU, and never paid any interest or repaid any portion of the principal of the borrowed money.
2.571 Revere Street, Revere
On November 21, 1983, the City of Revere deeded a small piece of property, 4,120 square feet, to Peter for $2,000.[7] [Ex. 19.] The parcel was contiguous to 571 Revere Street, where Peter was then running the Key Largo bar/nightclub. In early 1987, efforts were made to sell 571 Revere Street, which was held in the Trust, and the adjacent parcel owned by Peter. A purchase and sale agreement (the P&S) was prepared by Rome, and signed on February 13, 1987 by Rosemarie, as Trustee of the Trust, and Peter, both as sellers. [Ex. 21.] Three individuals identified in the P&S were the buyers. Rosemarie had no participation in the negotiations of the P&S. She was not consulted at all. She never met with or had any discussions with the buyers. She did not consult with Grace or the remainder beneficiaries under the trust before signing the P&S, which she signed at the direction of Fiumara, without any prior discussion. The sale did not go through, for reasons not explained at trial and apparently not known by Rosemarie.
After the sale fell through, on September 19, 1987, Peter deeded the small parcel adjacent to 571 Revere Street to Rosemarie, as Trustee of the Trust, for one dollar. [Ex. 20.] By that time, Key Largo had closed and Fiumara was maintaining the 571 Revere Street property. The larger 571 Revere Street parcel was already in the Trust, as Fiumara had deeded it to the Trust on November 14, 1986, when the Trust was created. Neither Peter nor Fiumara told Rosemarie about the transfer of the smaller parcel into the Trust. Rosemarie was not present when the deed to her was signed by her brother and did not even know about the deed for several years, until after Peter’s death in 1989. The Trust did not pay any consideration for the parcel.
The combined parcels ultimately became the locale for The Cove bar/nightclub, a business owned and operated by William Dolan. The Trust did not receive any rental income from The Cove, from the time it began operating until Fiumara’s death. Nor did the Trust pay any expenses of the property, including taxes and improvements. The Cove paid rent, at least at the time of Fiumara’s death, and for an unknown period prior thereto, to 571 Revere Street, Inc., a company principally owned and controlled by Fiumara during his lifetime. Only Fiumara controlled the occupancy and rent from The Cove. In fact, the Trust never received any rents or other income from any of the properties held in the Trust, and never paid any of the upkeep/maintenance, taxes, or capital expenses of any of the properties held by the Trust. The only income tax return that could be found for the Trust was filed for 1990 and reflected no income, despite the fact that the Trust held at least one (604 Squire Road), if not more, income-producing properties at that time.
3.604 Squire Road, Revere
The property located at 604 Squire Road was deeded to Fiumara on October 31, 1978. [Ex. 16, p.4.] He deeded it to the Trust on November 14, 1986. It remained in the Trust at the time of Fiumara’s death on July 4, 2005. The Squire Lounge, a nude dancing club, was located on the property at all relevant times. In fact, according to Joseph, Fiumara purchased the Squire Lounge in 1974, several years before he purchased the property on which it was (and is) located. Although the property was held by the Trust, Rosemarie and the Trust had no involvement whatsoever with the property or the Squire Lounge. The Trust paid no expenses, and received no income from the property.[8] Rosemarie never had any discussions with Fiumara about the operation of the Squire Lounge, the upkeep of the property, its occupancy, or its rental income. The Squire Lounge was operated by Charger, a company principally owned and run by Fiumara during his lifetime. Charger paid all taxes on the property, as well as all ordinary and capital expenses. Rent payments went directly from Charger to Fiumara. [Ex. 58, checks from January 1988 to August 2005.] The rent was substantial. In 1988 it was $3,000 per month. Starting in 1989 it was $3,600 per month. In November 1998, rent increased to $4,850 per month. In August 2000 it increased to $7,500 per month, but was then decreased to $6,000 per month in November 2000, which is where the rent remained at the time of Fiumara’s death. Rosemarie had no role and no say in the decisions relating to the rent paid by Charger to Fiumara for 604 Squire Road. Those matters were handled completely by Fiumara.
Personal federal income tax returns for Fiumara and Grace (when applicable) were introduced into evidence for the tax years 2000 through 2005. [Ex. 52-57.] Each return reflects as income from rental real estate [i.e., Schedule E] the rent paid by Charger to Fiumara for 604 Squire Road.
4.239 Oakwood Avenue, Revere
The last of the four properties placed in the Trust on November 14, 1986 was 239 Oakwood Avenue, Revere. Fiumara bought the property, a vacant parcel of land, on February 28, 1979 [Ex. 32], and held it in his name until he transferred it to Rosemarie, as Trustee of the Trust, on November 14, 1986. [Ex. 16.] On August 12, 2000, despite record ownership in the Trust, Fiumara personally deeded 239 Oakwood Ave *460 nue to James M. Carter and Suzanne E. Carter (collectively, the “Carters”) for stated consideration of $150,000. [Ex. 33.) James Carter was a friend of Fiumara and a former employee of J&R Veal. While title was in the name of the Trust, Fiumara paid all expenses related to the property. The Trust never paid any expenses for the property, and in fact, Rosemarie never saw or inspected the property. Consideration paid by the Carters for the property went to Fiumara, and was not received by the Trust. Rosemarie was not consulted by Fiumara about the sale of the property, was not present at the closing, and had no discussions with the Carters in connection with their purchase of the property. In fact, Rosemarie had no knowledge of the transaction and never even saw the deed from Fiumara to the Carters until after this litigation was commenced.
On February 9, 2001, the Carters deeded the property to Albia G. Bondar (“Bondar”). [Ex. 34.] For reasons not developed at trial, the defect in Bondar’s title to 239 Oakwood Avenue was eventually recognized and corrected. On June 15, 2004, Rosemarie, as Trustee of the Trust, deeded 239 Oakwood Avenue to Bondar for $1.00. [Ex. 37.] At the same time, Rosemarie executed a Trustee Certificate, asserting that the Trust was binding and in full force and effect, she was sole trustee, and had been authorized by all beneficiaries of the Trust to transfer title to 239 Oakwood Avenue to Bondar. [Ex. 36.] The certificate was not true. Rosemarie never discussed the transfer of 239 Oakwood Avenue with any beneficiaries, and never received their authorization to transfer the property. She was given the certificate (as well as the deed) without explanation by Fiumara, told to sign it, and did so. Rosemarie never met or spoke with Bondar.
5. Sheffield Heights Condominium Units
In the early 1980s, Fiumara became involved in the development of the Sheffield Heights Condominiums in Saugus. The principal developer was Harvey Pastan (“Pastan”). It appears that Fiumara’s role involved obtaining certain permits and approvals that Pastan had been unable to obtain. Whether monies were also invested was not established at trial. However, the agreed upon consideration, at least in part, for Fiumara’s role in the development was the transfer by Pastan (through a trust) to Fiumara of two townhouse condominium units. While construction was still ongoing, Fiumara instructed two of his children, Joseph and Nina, to see Pastan, go to the site, and choose the location of the unit each was going receive as a gift from him. Joseph and Nina did as instructed, and each eventually moved into separate condominium units: Joseph at 2702 Lewis O’Gray Drive; and Nina at 2606 Lewis O’Gray Drive. Neither paid any consideration for the purchase. Neither ever made mortgage payments, and neither was ever aware of a mortgage on the unit. However, they both paid all expenses of the condominiums once occupied, including condo fees and assessments, taxes, utilities, maintenance, and improvements. [Ex. 63, 64.] Fiumara did not pay for any post-occupancy expenses of the condominium units.
Joseph and Nina had no discussions with Fiumara about record ownership of the units, but both understood that the units had been given to them by their father, and at least Nina figured that Fiumara held title to her unit. They were not given deeds to the property and did not know how the properties were titled. In fact, Fiumara directed Pastan to transfer ownership of the units to Rosemarie, as Trustee of the Trust. Both Joseph and Nina had failed first marriages, and Fiumara apparently wanted to make sure that their spouses/former spouses had no claim to the condominium units. Nina was separated but not divorced when she first occupied her condominium unit. On April 23, 1987, each unit was deeded from Pastan (as trustee) to Rosemarie, as Trustee of the Trust, for stated consideration of $1.00. [Ex. 23, 24.] Rosemarie was not aware of the transfers of the units into the Trust. The Trust never paid any expenses of the condominium units and Joseph and Nina never paid any rent for their use and occupancy of the units. Neither Joseph nor Nina knew before the death of Fiumara that the two condominium units were held in the Trust.
After transfer of the condominium units into the Trust, disputes that were not described at trial broke out between Fiumara and Pastan. On September 29, 1993, and in connection with the dispute, Rosemarie, as Trustee of the Trust, granted Richard D. Gass, as Trustee of Tremont Street Realty Trust, a mortgage in the amount of $250,000 on the two condominium units in the Trust. [Ex. 25.] The mortgage replaced liens that Pastan had obtained on the units, and was part of some “stand-still” agreement between Fiumara and Pastan. A confirmatory mortgage was signed by Rosemarie, as Trustee of the Trust, on March 30, 1994. [Ex. 28.] Rosemarie was not at all involved in the dispute between the two men, or involved in discussions leading up to the mortgage being granted. She learned about the mortgage when Fiumara instructed her to sign the document. Although the mortgage references a note of the same date, it was not offered into evidence at the trial, and Rosemarie has no recollection of signing a note. The Trust never paid any monies in connection with the mortgage or on any note secured by the mortgage. The dispute between Pastan and Fiumara was eventually resolved and the mortgage was discharged on October 31, 2005. [Ex. 31.] Reciprocal releases were also exchanged, although only the November 10, 2005 release by Pastan (and others) in favor of the estate of Fiumara (and others) was introduced into evidence. [Ex. 29.] The releases finally resolved a series of -pending lawsuits between Pastan and Fiumara.
*461 6. 12 and 14 Kondelin Road, Gloucester
On April 15, 1988, Fiumara, through his company, Brunswick Finance Corp. (“Brunswick”), took title by way of a foreclosure sale of the property (and buildings thereon) of two parcels of land on Kondelin Road, Gloucester. [Ex. 38.] On March 21, 1994, Brunswick, by its President, Fiumara, deeded the Kondelin Road property to Rosemarie, as Trustee of the Trust, for stated consideration of $1.00. [Ex. 39.] Rosemarie did not know of the transfer of the property into the Trust. She was not familiar with Kondelin Road, and has never been there, although she now understands that the property was some sort of commercial fishing business/property. She did not know the property was in the Trust until she was directed to sign documents by Fiumara transferring a portion (14 Kondelin Road) of the property to a third party. A confirmatory deed to the Trust was signed on April 6, 2000 by Fiumara, as President and Treasurer of Brunswick. [Ex. 40.] On that same date, Rosemarie, as Trustee of the Trust, deeded 14 Kondelin Road to Paul B. Wright (“Wright”) for stated consideration of $50,000, and in a second deed, to Wright for a stated consideration of $1.00. [Ex. 42, 44.] Rosemarie also signed Trustee Certificates on April 6, 2000, asserting that she was the sole trustee of the Trust, it had not been altered, amended, revoked, or terminated, and that she was duly authorized by all of the beneficiaries to execute the deed for 14 Kondelin Road to Wright. [Ex. 41, 43.]
In fact, Rosemarie did not consult with or receive authorizations from any beneficiaries before signing the certificates. Not at that time, and at no time prior to Fiumara’s death, did Rosemarie even know for sure the identities of the beneficiaries of the Trust. She thought that Fiumara and Grace were beneficiaries of the 35 Hyde Avenue residence, and Fiumara was the beneficiary of the commercial properties, but she always considered, as Fiumara himself obviously did, the properties in the Trust to be Fiumara’s properties, for him to do with as he wished. She had no knowledge until after Fiumara’s death that she and her siblings and/or their issue were named as remainder beneficiaries of the Trust. The first time she saw a complete copy of the Trust was in 2006, well after her father’s death. She was directed on April 6, 2000 by Fiumara to sign the deeds and certificates. She never questioned Fiumara, then or on other occasions, when he directed her to sign documents as Trustee of the Trust. She would have signed anything he directed her to sign. She, and obviously Fiumara himself, considered the properties to be his. Rosemarie’s sister Joanne testified similarly when asked about her signature as a trustee for a different trust, stating that she just signed anything Fiumara told her to sign. Rosemarie never met Wright, and had no involvement in the events leading up to the sale to him of property on Kondelin Road. The Trust did not pay any expenses of the sale of the property to Wright, and did not receive any consideration from the sale.
On November 13, 2002, at Fiumara’s direction, Rosemarie deeded the property at 12 Kondelin Road to Fiumara, for stated consideration of one dollar. [Ex. 45.] She had no discussions with him about the reasons for the transfer. Nearly a year later, Rosemarie executed a Trustee Certificate related to the sale of 12 Kondelin Road to Fiumara, where she once again asserted that she had been authorized by the beneficiaries of the Trust to convey the property to Fiumara. [Ex. 47.] No such authorization had been sought or received.
On September 29, 2003, Fiumara deeded the 12 Kondelin Road property to Gilbert B. and Elizabeth P. Guerin (collectively, the “Guerins”), for stated consideration of $600,000. [Ex. 49.] On the same date, the Guerins granted Fiumara a mortgage on 12 Kondelin Road, to secure a promissory note in the amount of $500,000. [Ex. 50.] For tax/calendar years 2002 and 2003, Fiumara’s federal income tax returns showed rental income from the 12 Kondelin Road property. [Ex. 54,55.] Starting in 2003, his federal personal income tax return showed interest earned from the note and mortgage granted by the Guerins. [Ex. 55, 56, 57.]
DISCUSSION
Over seventy-five years ago, the Supreme Judicial Court, with respect to a challenged trust of personal property, noted in words equally applicable to this case:
It is so common for an owner of personalty to put the apparent title in his own name as trustee for another who furnishes no consideration, without any intent to create a genuine present interest in that other or to surrender any part of his own dominion over the property, that the law is skeptical of the reality of a trust so declared. The mere statement that one is trustee for another does not define the nature and extent of the trust, nor show that if a trust is really contemplated it is lawful in purpose. Often the real intent is testamentary. Unless there is something more than the words that one is trustee for another, to show that a present creation of an equitable interest is intended and that the settlor has ceased to have full dominion, the nominal cestui [i.e., beneficiary] has no rights.
Murray v. O’Hara, 291 Mass. 75, 77 (1935); see also Schleifstein v. Greenstein, 9 Mass.App.Ct. 344, 355 (1980), quoting first sentence of same language). The facts before this court give reason to be more than skeptical. The evidence is overwhelming that Fiumara never intended to create an equitable interest in properties deeded to the trust, and never ceased to have full dominion and control over those properties.[9]
“Massachusetts law requires three elements to create an express trust; an intent to create a trust, a clearly defined identifiable trust res; and identifiable beneficiaries.” Raso v. Lago, 958 F.Sup. 686, 699-700 (D.Mass. 1997), citing Curran v. LeRoux, 157 B.T. 500, 509 (Bankr.D.Mass. 1993). “[T]he question whether a *462 trust exists is essentially a question of fact, . . . and the existence of a trust does not depend upon the terminology used.” Russell v. Russell, 18 Mass.App.Ct. 957, 959 (1984), citing Russell v. Myers, 316 Mass. 669, 672 (1944), and Rugo v. Rugo, 325 Mass. 612, 616 (1950). “Whether a trust is created depends primarily upon the manifestation by the [settlor] of an intention to create a trust.” Ventura v. Ventura, 407 Mass. 724, 726 (1990). “In order for a trust to be valid in the Commonwealth, it must unequivocally show an intention that the legal estate be vested in one person to be held in some manner or for some purpose on behalf of another ... In the case of an express trust, such as is alleged in the present case, this intention to separate legal and equitable control over particular property should be ascertained from the language of the whole [trust] instrument considered in the light of the attendant circumstances.” Id., citing Cooney v. Montana, 347 Mass. 29, 35 (1964), and Harrison v. Marcus, 396 Mass. 424, 429 (1985).
The question of the identity of the settlor of the Trust in this case is disputed by the parties, but is easily resolved. “The settlor of an express private trust is the person who, directly or indirectly, causes the trust relationship to come into existence . . . One who furnishes the consideration necessary to induce another to create a trust is the settlor of the trust when it is created.” Bogart & Hess, The Law of Trusts and Trustees, §41 (3rd edition 2007). The Trust identities Grace as the settlor, but the words of the trust document are not controlling. It was Fiumara and not Grace who made all financial and business decisions in his family. It was Fiumara who decided to create the Trust in response to his near financial ruin in 1986. It was Fiumara who selected and arranged for Rosemarie to be the Trustee of the Trust. Four properties were deeded into the Trust when it was created on November 14, 1986. Three of those properties, 571 Revere Street, Revere, MA, 239 Oakwood Avenue, Revere, MA, and 604 Squire Road, Revere, MA, were transferred to the Trust solely by Fiumara. It was only the residence at 35 Hyde Avenue, Newton, MA, that was transferred into the Trust by Fiumara and Grace, as tenants by the entirety. The record establishes that Grace was no more involved in the creation of the Trust than Rosemarie was in becoming Trustee. Both Grace and Rosemarie merely signed what was put in front of them at Rome’s office on November 14, 1986. There is no reason to believe, and the record does not support any such inference, that Grace knew she was the named settlor of the Trust, that she was involved in any way other than as a signatory in the creation of the Trust, or that she even knew any of the terms of the Trust, including her status as the lifetime income beneficiary. To consider Grace the settlor of the Trust, or even a co-settlor, would ignore the reality of the Fiumaras’ marital relationship with respect to financial and business matters. It was Fiumara, both directly, by deeding three properties he held in his own name and his tenants by the entirety interest in 35 Hyde Avenue to the Trust, and indirectly, by causing Grace to deed her tenants by the entirety interest in 35 Hyde Avenue to the Trust, that caused the Trust to be created.[10]
Fiumara was the settlor of the Trust, and whether a trust was created depends primarily upon whether Fiumara manifested an intention to create a trust. “A manifestation of any intention to create a fiduciary relationship with respect to property, [which] subjects] the person to whom the title to the properly is held to equitable duties to deal with the properly of another person will ordinarily establish the existence of a trust.” Russell, 18 Mass.App.Ct. at 959, quoting Restatement (Second) of Trusts, §2(1957). Put in other words, the question is whether Fiumara manifested an intention to vest legal title in Rosemarie as Trustee and impose on her fiduciary responsibilities with respect to the equitable interests of the beneficiaries. “If a property owner who is capable of creating a trust purports to create a trust but lacks intent to do so, no trust arises.” Bogart & Hess, The Law of Trusts and Trustees, §46 (3rd edition 2007).
The Trust document itself is not controlling, as “(t]rust instruments must be construed to give effect to the intention of the settlor as ascertained from the language of the whole instrument considered in the light of the attendant circumstances.” Harrison, 396 Mass. at 429, citing Groden v. Kelley, 382 Mass. 333, 335 (1981). “Usually the settlor’s spoken or written words will show the settlor’s intent, but other types of proof may suffice. For example, a settlor’s acts with regard to title, possession, and income or conduct toward the alleged beneficiary may show a trust intent, although the settlor made no express statement to that effect.” Bogart & Hess, The Law of Trusts and Trustees, §45 (3rd edition 2007). That being the case, those acts may equally show an absence of a trust intent.
The “attendant circumstances” in this case, both before and after November 14, 1986, are overpowering. Fiumara was on the brink of financial ruin in 1986. He had lost his food businesses and the Beacon Hill property he used to secure a business loan. He wanted a legal mechanism to protect his residence and business properties in the event that future business ventures soured. He had no intention to use the Trust to provide annual income payments to Grace. He had lost one valuable properly due to financial problems in an unrelated business venture, and he did not want to risk that occurring again. His sole purpose in creating the Trust was to shield personal and business assets from potential future creditors.
A settlor, upon creation of a valid trust, and except as expressly provided otherwise by the Trust, has “no rights, liabilities or powers with regard to the trust administration.” Bogart & Hess, The Law of Trusts and Trustees, §42 (3rd edition 2007). But here, Fiumara had no intention to relinquish his dominion over the properties placed in the Trust, let alone vest meaningful legal *463 title in Rosemarie as Trustee. He intended to continue to treat the properties as if solely owned by him, with the protection he believed would shield them from his personal or business creditors. Fiumara wanted asset protection from the Trust, but he had no actual intention of relinquishing either legal or equitable interests in the properties.[11] At most, Rosemarie acted as a nominee, used merely to sign documents as Trustee that were required to transfer interests in Trust properties by way of deeds or mortgages. Until signatures were required, Rosemarie did not even know what properties, other than 35 Hyde Avenue, were held by the Trust. She was never involved in any responsibilities of upkeep, maintenance, and improvements to Trust properties. She was never involved in any decisions regarding the transfer of any Trust properties. The Trust never spent a dollar toward the expenses of any property deeded into the Trust. Rosemarie was merely a signatory who followed Fiumara’s directions after Fiumara made decisions about Trust properties as if they remained in his name and under his total control.
Fiumara also had no intention to impose fiduciary obligations on Rosemarie on behalf of the beneficiaries of the Trust. The only obligation Fiumara imposed on Rosemarie was to sign whatever he placed before her, an obligation that was certainly understood as mandatory in the Fiumara family. There was no question in Fiumara’s mind, or in Rosemarie’s, that she would do as he instructed. Rosemarie never even saw a copy of the Trust until after Fiumara’s death. She did not know the identity of the beneficiaries, or the rights of beneficiaries, such as Grace’s right to income for life. Rosemarie never saw or was given a single dollar of income from the several income producing properties held by the Trust. When properties such as 239 Oakwood Avenue and the Kondelin Road properties were sold, the Trust did not receive the consideration paid by the purchasers of those properties. Fiumara never gave Rosemarie the means to exercise fiduciary obligations on behalf of the beneficiaries, because he never intended that the beneficiaries have any benefit from the Trust.
In many respects, this case is similar to Porreca v. Gaglione, 358 Mass. 365 (1970). In that case, brother and sister plaintiffs were the siblings of the primary defendant. The three siblings’ father (“Gennaro”) conveyed three parcels of property to a straw, who then conveyed them to his defendant son (“Lorenzo”), as trustee under a written trust instrument. The trust required Lorenzo to hold the properties for the benefit of his two plaintiff siblings. The trustee was required to collect and receive all rents and income and hold the balance of net income for the plaintiffs as beneficiaries. The remainder of the trust, upon its termination, was to be divided equally between the plaintiff beneficiaries. Id. at 366. The trust was created in an effort and with the intention of protecting the properties from attachment or levy by Gennaro’s son-in-law, with whom he had had recent difficulties and litigation. Id. at 367. Within two years of the creation of the trust, Lorenzo, as trustee, deeded at least two of the properties back to Gennaro, who many years later deeded them back to Lorenzo and his wife. Id. During Gennaro’s lifetime, which ended twenly-six years after the creation of the trust, Gennaro retained control of all of the properties, collected all rents, and paid all bills with respect to the properties, and treated the properties as his own until his death. Id. A master made the following “ultimate findings”:
The trust instrument of June 8, 1933, was created by Gennaro “merely to put the properties in question beyond the reach of a claimant”; he never intended to create a valid and binding trust. He never divested himself of the control of the property through the trust instrument and at all times during his life retained control and possession over the property and the proceeds derived therefrom for his own use. Lorenzo never accepted the trust and never assumed the duties of trustee. In so far as it was a question of fact the master concluded that the plaintiffs [i.e. beneficiaries of the trust] have no interest in the West Street and Second Street properties or in the proceeds derived therefrom.
Id, at 368.
The Porreca plaintiffs in their appeal argued that the master erred in concluding that the trust was invalid because the settlor [i.e. Gennaro] never intended to create a valid trust. In rejecting plaintiffs’ arguments, the Court accepted the master’s findings as conclusive, as they were not on their face inconsistent or plainly wrong, and concluded: “To prevail the plaintiffs were required to show that they had an interest in the property as beneficiaries of a valid, subsisting trust. But, as the findings of the master make plain, no trust ever came into existence.” Id. at 369.
Similarly, this court has concluded that Fiumara never intended to create a valid trust. Like Gennaro in the Porreca case, Fiumara only intended to put the properties in question beyond the reach of creditors, he never divested himself of control of the properties in question, and at all times during his life retained control and possession over the properties in question and the proceeds derived therefrom. As was the case in Porreca, the Hyde Avenue Realty Trust never came into existence.
DECLARATION OF RIGHTS
1. The Hyde Avenue Realty Trust is void from its inception as a sham that never actually functioned as a trust and was designed merely to shield Fiumara’s assets from creditors.
2. Each and every parcel of property deeded into Trust (excepting the two condominium units) was at all times under the exclusive control and for the exclusive benefit of Fiumara. At no time did Fiumara create a valid equitable interest in those properties in favor of Trust beneficiaries.
*464 3. The following properties were not divested from Fiumara’s ownership by deeds transferring them into the Trust. Each property, or proceeds therefrom, is currently held by the Trust in constructive trust for the Estate of Peter J. Fiumara, and Rosemarie, as Trustee of the Trust, is empowered to transfer the properties still in the Trust’s name, as well as the proceeds from the sale of 35 Hyde Avenue, to the Estate of Peter J. Fiumara.
a. 35 Hyde Avenue, Newton, MA (proceeds from sale of property)
b. 571 Revere Street, Revere, MA, including the 4,120 square foot parcel deeded into the Trust by Peter J. Fiumara, Jr.
c. 604 Squire Road, Revere, MA
ORDER FOR JUDGMENT
Judgment shall enter on Count One of the plaintiffs’ first amended complaint, declaring the rights of the parties under the Hyde Avenue Realty Trust, as declared above.

The executrixes owe the estate a duty to take all reasonable actions necessaiy to protect the estate’s assets. Grossman v. Grossman, 343 Mass. 565, 569 (1962); G.L.c. 230, §5. They are the only appropriate persons “to institute proceedings for the recovery of property [of the estate], which if recovered, is held in trust for creditors. ” Fourth National Bank of Boston v. Mead, 214 Mass. 549, 551 (1913). The defendant grandchildren (who are the only active defendants contesting this action) succeeded in dismissing so much of the executrixes’ original complaint that sought a declaration that the trust was invalid as a fraud on creditors. [D. 32.] The court ruled the executrixes lacked standing to assert such a claim. As for the remaining claims for declaratory relief now stated in the first amended complaint, the grandchildren do not contest the authority or standing of the executrixes to pursue this declaratory judgment action.

It appears that the plaintiffs’ unjust enrichment claim has been resolved by an agreement among the parties that also resolved the grandchildren’s claims regarding two condominium units held by and in the trust.

A11 children will be referenced herein by their first names.

Flumara had purchased the property known as 571 Revere Street from Pasquale Verro and Louise M. Verro on June 29, 1976. The single deed into Fiumara described four separate, apparently contiguous parcels. [Ex. 18.] The deed out by Fiumara to Rosemarie as Trustee of the Trust on November 14, 1986, referenced the deed into Fiumara from the Verros, but described only three of the four parcels. [Ex. 16.] On February 6, 1987, a confirmatory deed was signed by Fiumara conveying all four parcels received from the Verros to Rosemarie as Trustee of the Trust. [Ex. 60.] The mistake was apparently recognized when efforts, ultimately unsuccessful, were made in early 1987 to sell the 571 Revere Street property.

The deed from Fiumara to the Trust describes the Oak-wood Avenue property as “245 Oakwood Avenue.” That same property is later described in deeds out from the Trust as 239 Oakwood Avenue. There is only one Oakwood Avenue property involved in this case, and the court will describe it as 239 Oakwood Avenue. It was suggested that the different street numbers was a function of renumbering and has no substantive meaning in this case.

Rosemarie, as Trustee of the Trust, was the plaintiffs’ primary witness at trial. The court is aware that she and Nina have a financial interest in the outcome of the declaratory judgment action they have commenced as co-executrixes of Fiumara’s estate. Rosemarie and Nina are only one-sixth beneficiaries under the Trust, but are one-half residual beneficiaries (through a separate trust) under Fiumara’s will. If plaintiffs are successful in their effort to have Trust properties declared part of Fiumara’s estate, Rosemarie and Nina will move from one-sixth beneficiaries to one-half beneficiaries with respect to any such properties. Nevertheless, the court finds Rosemarie and Nina credible in all respects and accepts their testimony in full.

There was no evidence as to who, between Peter and Fiumara, paid the $2,000 consideration for the parcel, orwho made the decision to add the parcel to the larger 571 Revere Street parcel. The smaller parcel is apparently a portion of the parking lot for the larger 571 Revere Street property, and the business located thereon. Although Peter was running Key Largo at the time, the rest of the property at 571 Revere Street had been owned by Fiumara before he conveyed it into the Trust on November 14, 1986. Thereafter, or at least after Key Largo closed, Fiumara, through a corporation, received all rents from the property. Given Fiumara’s desire to keep property out of his own name, and his autocratic rule of his family, it is more likely than not in this court’s mind that Fiumara purchased the small parcel with his money for his own business purposes and controlled and directed Peter with respect to the property just as he controlled and directed Rosemarie with respect to properties held by the Trust. Accordingly, this court finds that Fiumara, despite record ownership of the parcel in Peter’s name, was the actual owner and person in control of the property. Peter was nothing more than a nominee for Fiumara.

The Trust never had a checking account from which to pay expenses or a bank account into which to deposit revenues.

Contraiy to the grandchildren’s arguments, Rosemarie’s conduct is not the focus of this case. It is Fiumara’s intention in November 16, 1986 that is the focus of this case. Rosemarie’s conduct, and Fiumara’s as well, merely constitute the attendant circumstances to the purported creation of the Trust. It is not Rosemarie’s conduct as Trustee that invalidates the Trust. It is Fiumara’s clear intention not to divest himself of the legal and equitable interests in Trust properties that invalidates the Trust.

The same can be said about every other property deeded into the Trust. Each later property transferred to the Trust was caused by Fiumara, who is in this court’s view the only genuine settlor of the Trust. The court has already found that Fiumara caused Peter to take title to the sliver of land in Revere and deed it to the Trust. Similarly, Fiumara caused Pastan to deed two Sheffield Heights condominium units into the Trust, and caused Brunswick Financial to deed the Kondelin Road properties to the Trust.

 Although the court is informed of Fiumara’s intent by the way he continued to exercise dominion over the Trust properties after they were deeded to the Trust, it is Fiumara’s intent on November 14, 1986 that is the determinative issue in this case. If no intention to create a trust existed, as this court finds, then no valid trust was created. Thus, the court rejects as misplaced the grandchildren’s argument that “a settlor’s conduct after an irrevocable trust has been established will not alter the nature of such a trust.” Laylock v. Hammer, 141 Cal.App.4th 25, 31 (Cal.Ct.App. 2006). Here, no trust was established on November 14, 1986. For the same reason, the grandchildren’s reliance on Laylock v. Robsham, 442 Mass. 205 (2004), is misplaced. In Lattuca, ”[t]he judge found that the requisite intent, property, and identifiable beneficiaries existed in 1989 to create the [trust], and there was no evidence of termination.” Id, at 216. Here, the Trust was not created in 1986 due to an absence of “the requisite intent.”